E-filed on 9/27/2011

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOHN ROSCOE and NED ROSCOE,<br><br>Defendants. | NO. CR-07-00373-RMW<br><br>ORDER PRELIMINARILY DETERMINING LOSS AMOUNT UNDER U.S.S.G. §2B1.1 |

Pursuant to the request of the parties, the court held a hearing to determine the amount of loss attributable to Ned Roscoe under §2B1.1(b)(1) of the Sentencing Guidelines ("U.S.S.G. ____"). Roscoe was found guilty of conspiracy to defraud Comerica Bank, defrauding Comerica Bank and making false statements to the Bank. He is now awaiting sentencing.

I

Roscoe's conviction arose out of submissions to the Bank made between May and November 2003 by Roscoe on behalf of Cigarettes Cheaper!, a company owned by Roscoe's family and of which he was an executive officer. Cigarettes Cheaper! had a long standing relationship with Comerica Bank consisting of an asset-based line of credit. The requirements of the line of credit had been modified a number of times as a result of Cigarettes Cheaper!'s financial condition. Repayment of the amount loaned on the line of credit was secured by the company's inventory and

1
ORDER PRELIMINARILY DETERMINING LOSS AMOUNT UNDER U.S.S.G. §2B1.1
NO. CR-07-00373-RMW

personally guaranteed by Roscoe and other family members. During the relevant period, the Company could borrow up to 65% of the value of its inventory. It submitted weekly reports of its inventory ("borrowing base certificates") attesting to the value of the inventory. Robert Mazur, the Chief Financial Officer of Cigarettes Cheaper!, signed the certificates for the Company until May of 2003, when he refused to continue doing so because he did not believe the contents of the certificates Roscoe wanted to submit were truthful. Thereafter, Roscoe signed or directed the signing of the certificates he knew to be fraudulent. Roscoe was convicted of submitting thirteen borrowing base certificates with exaggerated statements of the value of Cigarette Cheaper's inventory. By November 14, 2003, the value of the inventory was overstated in an amount in excess of $16,000,000. When the Bank suspected the fraud and demanded an explanation, Roscoe instructed Mazur to say that the exaggerated figures resulted from "clerical and accounting errors."

In three of the fraudulent borrowing base certificates, the increased reported value of Cigarettes Cheaper!'s inventory enabled Cigarettes Cheaper! to draw down an additional $571,000 on its line of credit. By maintaining inflated inventory values on all of its other borrowing base certificates, Cigarettes Cheaper! avoided having to make payments to the Bank from a "dominion of funds" account. Comerica Bank had set up the dominion of funds account to call for the sales revenue realized by each of the individual Cigarettes Cheaper! stores to be paid into an account controlled by the Bank. If Cigarettes Cheaper!'s inventory was of sufficient value to provide the security required for the line of credit, the revenues would be paid over to Cigarettes Cheaper! If they were not sufficient, the Bank would take funds from the dominion of funds account to pay down the line of credit as needed to maintain the required inventory value/loan amount ratio. As of November 14, 2003 the value of Cigarettes Cheaper!'s inventory was overstated by more than $16,000,000 which meant that Cigarettes Cheaper! had a balance more than $10,700,000 in excess of that authorized by the terms of the line of credit. Not only did the fraudulent borrowing base certificates hide from the Bank the inadequacy of Cigarettes Cheaper!'s inventory, it allowed Cigarettes Cheaper! to use all the revenue realized by its stores and avoided the possibility that the Bank would call the loan.

During the time that Roscoe was submitting the fraudulent borrowing base certificates, Cigarettes Cheaper! was pursuing an antitrust lawsuit against R. J. Reynolds which Roscoe optimistically believed could result in a verdict that would solve Cigarettes Cheaper!'s financial problems. Cigarettes Cheaper! was desperately afraid that if its true financial condition became known before the lawsuit was tried, it would not be able to operate and its case against R. J. Reynolds would be jeopardized.

Since November 2003 the Bank has recovered some of the money loaned to Cigarettes Cheaper! from the security pledged to secure the line of credit. However, it is unclear what amount has been paid and what amount is still owed to the Bank.

II

Application Note 3 of U.S.S.G. §2B1.1 explains how "actual loss" and "intended loss" are defined and thus apply to the determination of the loss amount to be used under subsection (b)(1) of U.S.S.G. §2B1.1(b). *"'Actual loss' means the reasonably foreseeable loss that resulted from the offense."* App. Note 3(A)(i). *"'Intended loss' means the pecuniary harm that was intended to result from the offense."* App. Note 3(A)(ii). It is clear that Roscoe intended to mislead the Bank and successfully did so, enabling Cigarettes Cheaper! to draw an additional $570,000 on its line of credit to which it was not entitled. He also enabled Cigarettes Cheaper! to get the individual store revenues out of the dominion of funds account rather than having the Bank take them to pay down the balance on the line of credit. Roscoe intended to and did deprive the Bank of over $10,700,000 by reporting inflated inventory values which showed purported compliance with the inventory value/loan ratio required by the line of credit. The fact that Roscoe may have speculated that Cigarettes Cheaper!'s would be able to fully pay its obligation to the Bank in the future after prevailing in its pending case against R. J. Reynolds does not negate the intended loss. Since Roscoe misled Comerica into allowing the revenues collected from its individual stores to be paid to Cigarettes Cheaper! out of the dominion of funds account rather than to the Bank, Comerica allowed Cigarettes Cheaper! to keep over $10,700,000 that should have gone to pay down the line of credit and keep it secured by the true value of the inventory. The intended loss was $10,700,000.

The actual loss from Roscoe's fraud was the same as the intended loss. Although the Bank has apparently recovered some of the money owed to it from liquidation of some of the property securing the line of credit, there apparently remains approximately $16 million due the Bank.[1] Assuming that is the case and all the pledged security has been exhausted, the actual loss caused by Roscoe's fraud is the same as the intended loss, namely $10,700,000.

Roscoe argues that both the intended loss and actual loss are zero. He argues that the personal guarantees by the family members and the liens on their property, combined with the fact that Cigarettes Cheaper! was making regular payments on the interest due on the funds borrowed on the line of credit, show that Roscoe did not intend that the Bank suffer any loss. The court disagrees. The fact that a person speculates that if future events turn out favorably he will be able to pay back funds he acquired by fraudulent means does not mean that the loss was not intended. The loss was intended when the fraudulent certificates were submitted to the Bank. *See also* App. Note 3(a)(iii) to U.S.S.G. § 2B1.1.

Roscoe also contends that two credits must be taken against any loss of the Bank. Application Note 3(E)(i) and (ii) require that loss must be reduced by *[t]he " money returned, and the fair market value of the property returned . . . by the defendant before the offense was detected."* Loss is also to be reduced by, *"[i]n a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from the disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing."*

Roscoe is not entitled to any credit for money returned by the defendant before the offense was detected because no funds were returned before detection of the fraud. The second credit would seem to apply if the collateral was or is of sufficient value to pay off any outstanding balance on the line of credit, in other words, both the amount that Cigarettes Cheaper! was actually entitled to draw under the line of credit and the additional amount it was able to keep by fraudulently inflating the value of its inventory.

---

[1]This has yet to be proved.

Roscoe also claims that the Ninth Circuit established the methodology to be applied in calculating "loss" in a borrowing base case in *United States v. Berger*, 473 F.3d 1080 (9th Cir. 2007). Roscoe contends that *Berger* holds that only the additional money loaned based upon a particular fraudulent borrowing base certificate and not the whole outstanding balance on the defaulted loan is the loss suffered. *Id.* at 1104-06. Therefore, here, the loss, according to Roscoe, is only the additional $571,000 obtained by Cigarettes Cheaper! based upon three particular fraudulent borrowing base certificates. Further, since the amount recovered by the Bank from liquidation of pledged collateral exceeded $571,000, there was no loss.

Defendant overlooks several reasons that *Berger* does not govern here. First, the issue in *Berger* was how to determine restitution under the Mandatory Victims Restitution Act of 1996, 18 U.S.C. §3663A, not how to calculate loss under U.S.S.G. §2B1.1. Second, the court only held that the determination made by the district judge was reasonable—not that the method was required in all cases. Third, and of primary importance, the instant case involved conduct by Roscoe that misled the Bank so it would not take funds from the dominion of funds account, so the fraud was intended and did cause more of a loss than just enabling Cigarettes Cheaper! to obtain an additional $571,000 of borrowed funds. If the fraud had not occurred, the Bank would have been able to take revenues from the individual Cigarettes Cheaper! stores and apply them to Cigarettes Cheaper!'s account and brought it within the required inventory value/loan amount ratio.

Preliminarily, the court determines that both the intended and actual loss resulting from Ned Roscoe's fraud was more than $7,000,000 and less than $20,000,000. That results in a 20 level adjustment to the offense level. The court does not determine at this time whether other offense level adjustments are appropriate or whether the application of a 20 level adjustment for the loss would substantially overstate the seriousness of the offenses and justify a downward departure. *See* App. Note 19(C) to U.S.S.G. § 2B1.1.

DATED: 9/27/2011

*Ronald M. Whyte*
RONALD M. WHYTE
United States District Judge